**MISSOURI–KANSAS–TEXAS RAILROAD COMPANY et al., Appellants-Appellees,**

v.

**BROTHERHOOD OF LOCOMOTIVE ENGINEERS et al., Appellees-Appellants.**

**BROTHERHOOD OF LOCOMOTIVE ENGINEERS et al., Appellees-Appellants,**

v.

**MISSOURI–KANSAS–TEXAS RAILROAD COMPANY et al., Appellants-Appellees.**

No. 17580.

United States Court of Appeals Fifth Circuit.
April 20, 1959.

M. E. Clinton, Denison, Tex., W. A. Thie, M. W. Reeves, Denison, Tex., O. O. Touchstone, Dallas, Tex., for appellants and cross-appellees.

J. Hart Willis, Willis & Willis, Dallas, Tex., Harry E. Wilmarth, V. Craven Shuttleworth, Cedar Rapids, Iowa, Harold C. Heiss, Wayland K. Sullivan, Cleveland, Ohio, William P. Fonville, Dallas, Tex., Clarence E. Weisell, Cleveland, Ohio, for appellees.

Before RIVES, JONES and WISDOM, Circuit Judges.

RIVES, Circuit Judge.

At 6:00 o'clock A.M. on November 6, 1958, the engineers, firemen, conductors, brakemen and switchmen of appellant Railroad Companies struck and ceased work. The strike was called without notice to the Railroad Companies by the four railroad labor organizations.[1] The strike stopped all train operations of the Railroad Companies over 2919 miles of track extending from St. Louis and Kansas City, Missouri, on the north to Oklahoma City, Oklahoma, and to Houston and San Antonio, Texas, on the south. The strike was halted on the same day by a temporary restraining order issued by the district court upon the application of the Railroad Companies.

The strike had been precipitated by General Orders 119 and 120, issued October 2, 1958, by the Railroad Companies, effective at 12:01 A.M. on October 19, 1958. Those orders made certain changes in the intradivisional runs of freight trains and the away-from-home terminals for freight service between Wichita Falls, Texas, and Forgan, Oklahoma, a distance of 302 miles. Before the orders became effective, the National Mediation Board advised the Railroad Companies that the employees had invoked the services of that Board, but the Railroad Companies nonetheless placed the orders into effect as scheduled. About a month later, but prior to the hearing of their application for a preliminary injunction, the Railroad Companies undertook to submit the matters in dispute to the National Railroad Adjustment Board, and in part, to the National Mediation Board, and to Committees established by the collective bargaining agreements.

On December 18, 1958, the district court granted a preliminary injunction enjoining the strike pending decisions by said Boards and Committees, and in the same order, directed the Railroad Companies to restore and maintain conditions affected by their General Orders 119 and 120 to the conditions which existed prior to the effective date of such orders or, on the election of the Companies, pay the employees adversely affected by such orders the same amounts they would have paid such employees had the changes made by such orders not been effected.

On December 29, 1958, the Railroad Companies filed notice of appeal from that part of the order requiring them to restore and maintain the status quo pending the injunction. On January 5, 1959, they sought from the district court a stay of that portion of the order. The court then ruled that the injunction had been granted on condition that the Railroad Companies restore and maintain the status quo, and denied the stay requested by them and entered an order

---

1. The Brotherhood of Locomotive Engineers, The Brotherhood of Locomotive Firemen and Enginemen, The Brotherhood of Railroad Trainmen, and The Order of Railway Conductors and Brakemen.

so reciting. On January 6, 1959, the Railroad Companies obtained from this Court [2] a stay of that portion of the order dated December 18, 1958, requiring them to restore the status quo. On January 13, 1959, the Railroad Companies attempted to appeal from the district court's order of January 5, 1959.[3] On January 15, 1959, the defendant employees and labor organizations appealed from that part of the order of December 18, 1958, granting a preliminary injunction against them. The 302-mile line over which this controversy arose constitutes a separate seniority district for the engineers, firemen, conductors, and brakemen.

Prior to October 19, 1958, way freight crews on this line were assigned as follows:

Two crews between North Yard (Wichita Falls, Texas) and Welon (Altus, Oklahoma), a distance of 75.9 miles, daily except Sunday, with North Yard the home terminal for both crews, and with Sunday layover at North Yard for one crew and at Welon for the other crew;

One crew from Welon (Altus, Oklahoma) to Elk City, Oklahoma, and return, a distance of 58.3 miles in each direction, daily except Saturday, with Welon the home terminal and with Saturday layover at Welon;

One crew from Elk City, Oklahoma, to Guest (Woodward, Oklahoma), a distance of 84.8 miles, on Mondays, Wednesdays and Fridays, and from Guest to Elk City on Tuesdays, Thursdays and Saturdays, with Elk City the home terminal and with Sunday layover at Elk City; and

One crew from Guest (Woodward, Oklahoma) to Forgan, Oklahoma, a distance of 83.2 miles, on Mondays, Wednesdays and Fridays, and from Forgan to Guest on Tuesdays, Thursdays and Saturdays, with Guest the home terminal and with Sunday layover at Guest.

Such way freight assignments, or similar way freight assignments between North Yard (Wichita Falls, Texas) and Forgan, Oklahoma, have been in existence for more than twenty-five years.

Effective at 12:01 A.M. on October 19, 1958, the Railroad Companies rearranged assigned way freight service between North Yard (Wichita Falls, Texas) and Forgan, Oklahoma, as follows:

Assigned two way freight crews to operate between North Yard (Wichita Falls, Texas) and Elk City, Oklahoma, a distance of 134.2 miles, daily except Sunday, with North Yard the home terminal of both crews, and with Sunday layover at North Yard for one crew and at Elk City for the other; and

Assigned one way freight crew to operate from Elk City, Oklahoma to Forgan, Oklahoma a distance of 168 miles, on Mondays, Wednesdays and Fridays, and from Forgan to Elk City on Tuesdays, Thursdays and Saturdays, with Elk City the home terminal and with Sunday layover at Elk City.

This arrangement of way freight service was made in accordance with General Order No. 119.

Prior to October 19, 1958, North Yard (Wichita Falls, Texas) was the home terminal and Altus, Oklahoma, and Forgan, Oklahoma, were the bulletined away-from-home terminals for unassigned crews in through freight service between North Yard (Wichita Falls, Texas) and Forgan, Oklahoma. Effective at 12:01 A.M. on October 19, 1958, the Railroad Companies abolished Altus, Oklahoma, and Woodward, Oklahoma, as away-from-home terminals for unassigned crews in through freight service, es-

2. The panel being composed of Circuit Judges Tuttle, Jones, and Brown.

3. In view of our ruling on the appeal from the part of the order of December 18, 1958, requiring the restoration of the status quo, we find it unnecessary to rule upon the attempted appeal from the order of January 5, 1959.

tablished Elk City, Oklahoma, as an away-from-home terminal for such crews, leaving North Yard (Wichita Falls, Texas) as the home terminal and Forgan, Oklahoma, as an away-from-home terminal for such crews. This change in away-from-home terminals was made in accordance with General Order No. 120.

In response to the district court's question as to "the number of men that were put out of employment by the change," the counsel for the Railroad Companies replied, "There were ten."

While not so strongly urged,[4] the attacks of the defendants, cross-appellants, on the jurisdiction of the district court to grant the preliminary injunction are matters which cannot be waived and which we should consider at the outset. Indeed, we find the jurisdictional questions practically determinative of the appeal as well as of the cross-appeal.

■ No testimony of witnesses was heard in open court before the preliminary injunction was issued, nor did the district court make any findings of fact. Absent such testimony and findings, the defendants and cross-appellants insist that Section 7 of the Norris-LaGuardia Act, 29 U.S.C.A. § 107, deprived the district court of jurisdiction. The pertin-ent provisions of that section are quoted in the margin.[5]

The material facts were, however, admitted; that is, the strike, the matters in controversy (though not their legal effect), and the submissions by the Railroad Companies of the dispute to the National Railroad Adjustment Board and, in part, to the National Mediation Board and to the Committees established by agreement. Under such circumstance, the specific provisions of the Railway Labor Act, 45 U.S.C.A. § 151 et seq., take precedence over the more general provision of the Norris-LaGuardia Act. Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Company, 1957, 353 U.S. 30, 42, 77 S.Ct. 635, 1 L.Ed.2d 622.

■■ The Railway Labor Act creates the National Railroad Adjustment Board for the resolution of "minor grievances" in the event that the parties are unable to agree upon their settlement, that is compulsory arbitration in this limited field. It does not provide a process for a final decision of a "major dispute." Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Company, supra. As footnote 24 to the opinion in that case observes:

---

4. The position of appellees and cross-appellants is thus stated in brief:
   "* * * If the condition requiring the restoration of the status quo or the optional alternative payments be maintained in the order, the Employees are content to abide the determination of the various submissions made of the controversy by Carriers. Otherwise not."

5. "No court of the United States shall have jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute, as defined in this chapter, except after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto, if offered, and except after findings of fact by the court, to the effect—
   "(a) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will continue unless restrained, but no injunction or temporary restraining order shall be issued on account of any threat or unlawful act excepting against the person or persons, association, or organization making the threat or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof;
   "(b) That substantial and irreparable injury to complainant's property will follow;
   "(c) That as to each item of relief granted greater injury will be inflicted upon complainant by the denial or relief than will be inflicted upon defendants by the granting of relief;
   "(d) That complainant has no adequate remedy at law; and
   "(e) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection." 29 U.S.C.A. § 107.

"The Norris-LaGuardia Act has been held to prevent the issuance of an injunction in a railway labor case involving a 'major dispute.' Brotherhood of Railroad Trainmen v. Toledo, P. & W. R. Co., 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534." (353 U.S. at page 42, 77 S.Ct. at page 641, 1 L.Ed.2d 622.)

■■ The differences between major disputes which must still be settled through traditional processes of agreement and minor disputes which the National Railroad Adjustment Board has been empowered finally to resolve has been elaborately discussed in Elgin, J. & E. R. Co. v. Burley, 1945, 325 U.S. 711, 722 et seq., 65 S.Ct. 1282, 89 L. Ed. 1886, from which we quote briefly:

"The first relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future not to assertion of rights claimed to have vested in the past.

"The second class, however, contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement, e. g., claims on account of personal injuries. In either case the claim is to rights accrued, not merely to have new ones created for the future." (325 U.S. at page 723, 65 S.Ct. at page 1290.)

■ In the present case, collective agreements were in effect between the Railroad Companies and each of the Brotherhoods. The Brotherhoods claim that those agreements provide for notice and negotiation concerning establishment of or changes in district runs or numbers of crews assigned to them, with resolution of differences by Committees or officials designated in the collective agreements, and with the right of either party to invoke the services of the National Mediation Board. Upon the theory that the changes effected by Orders 119 and 120 amount to changes in *agreements* affecting rates of pay, rules or working conditions, the Brotherhoods claim that the Railroad Companies have violated Section 6 of the Railway Labor Act, 45 U.S.C.A. § 156, by not following the procedure therein prescribed. The Railroad Companies claim that the existing agreements relate to establishment of service, not to changes or rearrangement of service long established, and that they have retained their powers of management to change terminals and rearrange runs when business or changed conditions justify.

Without intimating any view as to their validity, we think it clear that the respective *contentions* of the Railroad Companies and of the employees are based upon existing agreements; their *claims* are to rights accrued and not to have new rights created for the future. The dispute is thus a "minor" dispute, the resolution of which is committed to the National Railroad Adjustment Board. Primary jurisdiction of that Board cannot be defeated by the emphasis with which any party asserts that its position is clearly the only rightful one, nor would it be appropriate for this Court to discuss the relative merits of questions which must be decided by that Board.

We conclude that the district court had jurisdiction to grant the preliminary injunction against a strike in this labor dispute in order to protect the primary jurisdiction of the National Railroad Adjustment Board to resolve the dispute.

Turning now to the appeal of the Railroad Companies, we do not find it necessary to decide whether the order of which they complain was a preliminary mandatory injunction against them or simply a condition upon which they were granted a preliminary injunction against the defendants. Whether injunction or condition, the order directed the Railroad Companies to restore and maintain conditions affected by their General Orders 119 and 120 to the conditions which existed prior to the effective date of such orders, or, at the election of the Companies, to pay the employees adversely affected by such orders the same amounts they would have paid such employees had the changes made by such orders not been effected. If we accept the premise, heretofore discussed and decided, that the dispute precipitated by General Orders 119 and 120 was a minor dispute which the National Railroad Adjustment Board alone had jurisdiction to resolve, then it is clear that the district court could not pass any sort of preliminary judgment upon the merits of that dispute. That kind of jurisdiction denied to the district court by the provisions of the Railway Labor Act cannot be exercised under the guise of discretionary equity powers to impose reasonable conditions upon the grant of an injunction, of requiring the plaintiff Railroad Companies to come into equity with clean hands, or upon any other theory whatsoever. To hold otherwise would permit the district court, in every case where either a railroad company or a labor organization seeks an injunction to protect the jurisdiction of the National Railroad Adjustment Board, to lift itself by its bootstraps into some kind of jurisdiction to pass preliminary judgment upon the merits of disputes committed to the exclusive jurisdiction of the Board.

That part of the judgment of the district court of December 18, 1958, requiring the restoration and maintenance of the status quo or the optional alternative payments, is therefore vacated; and, as thus modified, said judgment is affirmed.

Modified and affirmed.