ITASCA LODGE 2029, OF the BROTHERHOOD OF RAILWAY AND STEAMSHIP CLERKS, FREIGHT HANDLERS, EXPRESS AND STATION EMPLOYEES, an Unincorporated Association, Calvin B. Dirickson, Individually and as President of Said Association, Forrest M. Ross, Individually and as Secretary and Treasurer of Said Association, Richard W. Hendrixson, Individually and as Local Chairman of Said Association, and as Representatives of the Classes or Crafts of Employees Represented by Said Lodge, Appellants,

v.

RAILWAY EXPRESS AGENCY INCORPORATED, Appellee.

No. 18866.

United States Court of Appeals
Eighth Circuit.

March 27, 1968.

J. F. Souders, of Gruenberg, Schobel & Souders, St. Louis, Mo., for appellants and filed brief.

John H. Engel, Kansas City, Mo., for appellee. Herbert E. Bryant, St. Louis, Mo., was with John H. Engel, Kansas City, Mo., on the brief for appellee.

Before BLACKMUN, GIBSON and HEANEY, Circuit Judges.

GIBSON, Circuit Judge.

The appellants, comprising a Lodge of the Brotherhood of Railway Clerks, its Officers and Employees,[1] appeal pursuant to 29 U.S.C. § 110, the issuance of a temporary injunction by the U. S. D. C. for E. D. of Missouri prohibiting it from holding a special meeting of all of its members, which would have the necessary effect of causing a work stoppage on the appellee's, Railway Express Agency, Incorporated (R. E. A.), around-the-clock, seven days a week operation.

This case concerns a labor dispute between a carrier and its employees, represented by the Lodge, which is a unit of the certified bargaining representative, Brotherhood of Railway Clerks, for the employees of R. E. A.[2] The present dispute arose over the dismissal of an employee, Riden, and the abolishment by

1. The appellants full title, names and designations are as follows: "Itasca Lodge 2029, of the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees, an unincorporated Association, Calvin B. Dirickson, Individually and as President of said Association; Forrest M. Ross, Individually and as Secretary and Treasurer of said Association; Richard W. Hendrixson, Individually and as Local Chairman of said Association, and as Representatives of the Classes or Crafts of Employees Represented by Said Lodge", and will be referred to hereafter as "Lodge".

2. R. E. A. is a common carrier engaged in interstate commerce and is a "carrier" as defined in the Railway Labor Act, 45 U.S.C. § 151 et seq. and maintains, among others, local offices in the metropolitan St. Louis, Missouri, and East St. Louis Illinois area.

R. E. A. of a number of existing "bulletined" jobs. R. E. A. operates with a structure of regular or permanent jobs, designated as "bulletined" positions and an "Extra List Status Roster," which is also referred to as the labor "pool," from which daily assignments, on a seniority basis, are made to fill vacancies, absentees or open positions. Newly hired employees work at a lower rate of pay for the first sixty days of employment and seniority does not begin to accrue until an employee obtains a "bulletined" position. All new employees who have not obtained a "bulletined" position and all employees who have been "bumped" and reduced from a "bulletined" position (furloughed) form the labor "pool."

The Lodge in an attempt to prevent or curb the hiring of new employees so as to protect the available work for the men already in the labor "pool" caused a work stoppage on October 16, 1966 of approximately one and one-half days duration by calling a special meeting of all of its members. This labor dispute was resolved by R. E. A.'s Division Operation's Manager O'Malley signing a document under date of October 24, 1966 that had the effect of reducing the Extra List Status Roster to 75 individuals.[3] The Lodge considers this document of October 24, as a collective-bargaining agreement, while R. E. A. considers it as only a memorandum of understanding, disposing of certain complaints.

A new general working agreement was negotiated by the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees on a national level during December, 1966, with an effective date of January 1, 1967. The Lodge did not participate in these negotiations but it is covered by the agreement. No mention is made in the agreement of any limitation on the number of individuals that may comprise the Extra List Status Roster or labor "pool."

On March 27 and 28, 1967 R. E. A. notified the Lodge that it was abolishing 95 existing "bulletined" positions effective April 3 and 4, 1967. Conference was had between the parties on the dismissal of employee Riden and on the abolishment of the "bulletined" positions. The members of the Lodge Protective Committee stated that they would call a special meeting of all employees (thus causing a work stoppage) if Riden were not immediately reinstated[4] and apparently did not desire to continue the conference further on the issue of the abolishment of the "bulletined" positions.

The representatives of the Lodge posted on April 5, 1967 a "Special Meeting Notice" calling a meeting of the entire membership of the Lodge for April 7, 1967. The Lodge as a matter of regular procedure holds monthly meetings at split sessions, which allows all of its members to attend at least one of the split sessions and does not interfere with R. E. A.'s around-the-clock operation. The express purpose of the special meeting was to discuss eight items listed on the notice. Item 1 concerned the dismissal of Riden; items 2 through 7 concerned the abolishment of the "bulletined" positions, and

---

3. This writing in part reads as follows:
 "1. Extra List Status Roster. It was agreed that the Status Roster would be reduced to 75 by suspending hiring for a period of two weeks and by the elimination of all names on the Status Roster who have not accepted an assignment within seven (7) days. The 75 figure does not include men in military service. If over 75 names are necessary positions will be bulletined to cover the additional names added. When positions are abolished, furloughed will be included in the 75 figure:"

4. The Lodge does not make an issue of the Riden dismissal on this appeal. His dismissal is being processed according to the general grievance procedure set up by the parties in their agreement and was pending at the time of the hearing. The District Court found that the Lodge was processing Riden's dismissal in accordance with the Railway Labor Act and the collective-bargaining agreement of January 1, 1967, but that such procedures with respect to that matter had not been exhausted. We, therefore, give no further consideration to this aspect of the labor dispute at this time.

item 8 related to penalties for those failing to attend the special meeting. A further conference was held between the parties and certain of the items were either withdrawn, resolved or partially resolved but the Protective Committee informed Management that if the remaining items on the notice were not resolved, the special meeting called for April 7 would not be canceled.

R. E. A. then on April 6, 1967 filed its complaint for an injunction. A temporary restraining order was issued on April 6, 1967. A hearing was held by the District Court on May 5, 1967, which resulted in the issuance of the temporary injunction on May 15, 1967.

The 95 abolished "bulletined" positions were among the more desirable employments as the holders did not have to work over the weekend. These positions were held by the older seniority men and a "bumping" or displacement of these men from their positions would cause a reshuffling of positions all down the seniority line affecting about 400 to 450 employees. The Lodge contends it was thus faced with a dilemma. If the Lodge decided to seek compliance with the October 24, 1966 document limiting the number of men in the labor "pool" to 75 and was successful, then many lower seniority men would lose their jobs through layoff. But, if the Lodge acquiesced in the increase in the "pool" then the higher seniority men in the "pool" would have less work and consequently less pay. The Lodge's announced intention was that it desired to discuss its dilemma at a special meeting of all of its members rather than at any split meeting. The effect, of course, of a meeting of a full membership would be to cause a total work stoppage in R. E. A.'s metropolitan St. Louis operation.

The Lodge contends it has a constitutional right to call a meeting of its full membership; that the letter of October 24, 1966 constitutes a collective-bargaining agreement, which R. E. A. seeks to change by its unilateral action in violation of the terms of that agreement and the Railway Labor Act procedures for handling "major disputes"; and that the Norris-LaGuardia Act prohibits the issuance of this injunction. The Lodge also complains that the injunction is too broad in its application and prohibits its members from exercising basic rights of freedom of speech and assembly and sanctions involuntary servitude.

R. E. A. denies that the letter of October 24, 1966 constituted a collective-bargaining agreement and contends in any event that the document of October 24 was superseded by the comprehensive national agreement of January 1, 1967. R. E. A. also contends that the abolishment of the "bulletined" positions was permissible and procedurally proper under the January 1, 1967 collective-bargaining agreement. The Lodge apparently does not dispute this latter contention except that it maintains the October 24, 1966 document is still in force and effect as a collective-bargaining agreement. R. E. A. also contends that even if the October 24, 1966 letter is deemed to be a collective-bargaining agreement, its interpretation would constitute a "minor dispute" that should be processed under the Railway Labor Act procedures for the settlement of "minor disputes". R. E. A. says that it has no adequate remedy at law and that it will suffer irreparable damage if injunctive relief is not granted to prevent the work stoppage.

The District Court in issuing the injunction properly did not determine the merits of the dispute nor did it determine whether the October 24, 1966 letter was a presently effective collective-bargaining agreement. Rutland Railway Corporation v. Brotherhood of Locomotive Engineers, 307 F.2d 21, 33 (2 Cir. 1962), cert. denied 372 U.S. 954, 83 S.Ct. 949, 9 L.Ed. 2d 978 (1963). The District Court held that either under the January 1, 1967 collective-bargaining agreement or the October 24, 1966 letter, the grievances were "minor disputes" within the meaning of the Railway Labor Act; and found

that R. E. A. was ready and willing to comply with all of the procedures of the Railway Labor Act but that the Lodge had not complied with said procedures except as to grievance number 1. The Court also found " * * * that the major purpose in holding a meeting of Itasca Lodge 2029, at which all members are required to be present, is to effect a work stoppage until the grievances have been resolved, comparable to the meeting of October 17, 1966." The Court held the Norris-LaGuardia Act did not preclude the injunction and issued its order for temporary injunction, which reads in pertinent part as follows:

"The defendants herein and each of them, and all members of the defendant organization, and all persons acting in concert with or participating with defendants, be temporarily enjoined from:

"1. Calling, authorizing, attending or participating in any meeting of all members of Itasca Lodge 2029 at the same time or in such manner as to interfere with plaintiff's operations, to consider the matters set forth on the Special Meeting Notice of April 5, 1967, or any of them, or of any matters similar thereto;

"2. Authorizing, encouraging, inducing, approving or carrying out by direct or indirect means any work stoppage by reason or on account of any of such matters set forth on the said Notice or matters similar thereto."

Both parties properly agree that the Railway Labor Act, 45 U.S.C. §§ 151–163, is applicable to the labor dispute in question and each argues for the enforcement of the Act against the other party.

The general purpose of the Railway Labor Act, as stated in § 151a[5] is to avoid interruption of commerce, to encourage the unionization of employees and to provide for the prompt and orderly settlement of all disputes on the interpretation of agreements covering rates of pay, rules or working conditions. A duty is imposed on carriers and employees by § 152, First,

" * * * to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute * * * ".

Section 152, Second, commands that all disputes shall be considered and, if, possible, decided in conference between the representatives of the parties.

■ The Act as a whole contemplates, encourages and commands that the parties attempt to settle all "minor disputes," first through their grievance procedure and if that fails by compulsory arbitration before the National Railroad Adjustment Board; and contemplates and encourages conferences plus mediation on "major disputes" before the National Mediation Board, and later an Emergency Board appointed by the President, with any strike action postponed or delayed until the statutory procedures have been followed and exhausted.

Within the framework of this Act we consider the contentions of the parties. The Lodge asserts it has a constitutional

---

5. Section 151a of Title 45, U.S.C. is as follows:

"The purposes of the chapter are: (1) To avoid any interruption to commerce or to the operation of any carrier engaged therein; (2) to forbid any limitation upon freedom or association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this chapter; (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions."

right to call a meeting of all of its members, even though that action results in a work stoppage; that under Steele v. Louisville & Nashville Railroad Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944) it has the right and duty to give equal representation to its members; and this duty and right can only be discharged by allowing its affected employees to address the full membership of the Lodge on the grievance issues. Issues are settled by a majority vote of the members. The Lodge certainly has the right and duty to represent all members in its unit without discrimination and afford equal protection to the interests of the members of that unit. The members certainly have a right to express their views and this can be done before a split session, or arrangements can be made for the views expressed at one session to be made known to the members attending the other session. The *Steele* case does not command the result contended for by the Lodge. That case dealt with a racial situation where Negroes were refused membership in the Brotherhood, which represented them as employees in the craft, and which was the exclusive bargaining representative for that craft. A non-member employee of the representative Brotherhood has a right to express his views to the Brotherhood, but that case does not hold that this expression must be afforded at a full membership meeting that would occasion a work stoppage. As the District Court found: "The regular meetings of Itasca Lodge 2029 are conducted in a manner and at times which do not interfere with plaintiff's operation, and its meetings may be so conducted in the future whether or not they are the regularly scheduled meetings or special meetings." The Lodge can certainly protect the interest of its members without holding a meeting of the full membership; otherwise whenever the Protective Committee of the Lodge does not want to employ the procedure set forth under their collective-bargaining agreement and under the Railway Labor Act, it may refer the grievances to the membership for discussion and R. E. A.'s operation would be halted.

We agree with the District Court's finding that there is " * * * no basis in the evidence which supports defendants' contention that legitimate union activities require it to hold the contemplated special meeting in the manner here involved". The Lodge's contention of "involuntary servitude" in violation of the Thirteenth Amendment is specious as any individual member is free to quit his employment as he desires, the thrust of the injunction being against the concerted or group action of the Lodge and its members. The main issue is whether the District Court was justified in holding that the dispute in question was a "minor" one under the Railway Labor Act and whether the Court had the authority under the law to issue the injunction at this stage of the dispute.

The Supreme Court in Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Co., 353 U.S. 30, 77 S. Ct. 635, 1 L.Ed.2d 622 (1957) held that a railway labor organization could not resort to a strike over "minor disputes" pending before the National Railroad Adjustment Board and that any such illegal strike could be enjoined by the District Court, notwithstanding the Norris-LaGuardia Act. Self-help could not be resorted to once compulsory arbitration of a "minor dispute" was in progress.

Section 152, Sixth, defines the so-called "minor disputes" as follows:

"In case of a dispute between a carrier or carriers and its or their employees, arising out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions * * *."

The so-called "major disputes" are listed under § 152, Seventh, as follows: "No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title."

**664**

■ "Minor disputes" must be handled as provided in § 153, First(i)[6] in the usual procedural method provided in the collective-bargaining agreement, exhausting the administrative steps therein provided and, if unresolved by that procedure, then disputes may be referred, by either party, to the Railroad Adjustment Board for a final and binding award. While it is somewhat difficult to precisely define a so-called "minor" and so-called "major" dispute, a "minor" dispute generally is one that is concerned with the meaning or proper interpretation of a collective-bargaining agreement, and a "major" dispute concerns the obtaining of a collective-bargaining agreement or the amendment of an existing agreement. Mr. Justice Rutledge in Elgin, Joliet & Eastern Railway Co. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945) sets out the salient points in classifying the nature of a dispute under the Railway Labor Act:

"\* \* \* Congress has drawn major lines of difference between the two clases of controversy. ·

"The first [major dispute] relates to disputes over the formation of collective agreements or efforts to secure them. \* \* \* They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

"The second class [minor disputes], however, contemplates the existence of a collective agreement already concluded \* \* \*. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. \* \* \* In either case the claim is to rights accrued, not merely to have new ones created for the future.

"\* \* \* [Major disputes] present the large issues about which strikes ordinarily arise with the consequent interruptions of traffic the Act sought to avoid. \* \* \* [T]hey have been left for settlement entirely to the processes of noncompulsory adjustment.

"The so-called minor disputes, on the other hand, involving grievances, affect the smaller differences which inevitably appear \* \* \* incidentally in the course of an employment. \* \* \*." 325 U.S. 723–724, 65 S.Ct. 1289–1290.

■ We do not decide whether the October 24, 1966 letter is a binding agreement or whether it has been superseded by the January 1, 1967 collective-bargaining agreement. Rutland Railway Corporation v. Brotherhood of Locomotive Engineers, 307 F.2d 21, 33 (2 Cir. 1962), cert. denied 372 U.S. 954, 83 S.Ct. 949, 9 L.Ed.2d 978 (1963). But in any event what remains at issue still constitutes a "minor dispute," a dispute arising out of the interpretation and application of rules or working conditions provided for in a binding agreement or agreements. "Major disputes," on the other hand, "look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past." Elgin, Joliet & Eastern Railway Co. v. Burley, supra. The Lodge raises no question on the abolishment of the "bulletined" jobs being in violation of the January 1, 1967 collective-bargaining agreement, but predicates its dissent or dilemma on the abolishment action on the October 24, 1966 letter. R. E. A. disavows any attempt to change any existing agreement with the Lodge. It made a good-faith interpretation of the October 24, 1966 letter in conjunction with the January 1, 1967 agreement and determined that the abolishments were

6. Section 153, First (i) reads:
"The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, \* \* \* shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes."

permissible. If R. E. A. is wrong that matter can be fairly resolved by the Railroad Adjustment Board.

We realize that a fine line often separates a "major" and "minor" dispute and as Judge Waterman in Rutland, supra, stated (307 F.2d at p. 33) it, " * * * is often a question of degree." but we are here concerned with the operation and rules of a labor "pool" under an existing collective-bargaining agreement. Obviously all positions are not frozen and R. E. A. has some authority to limit its labor force to accommodate the volume of business at hand. The Lodge's concern about the size of the labor "pool" and whether it really desires a smaller labor "pool" with consequent more work for senior furloughed members or a larger "pool" with consequent spreading of the available work is a decision it should collectively make without subjecting the public and the carrier to the inconvenience and damages accruing from a work stoppage in contravention of the Railway Labor Act. See Missouri-Kansas-Texas Railroad Company v. Brotherhood of Locomotive Engineers, 266 F.2d 335 (5 Cir. 1959), rev'd on other grounds, 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1379 (1960); Hilbert v. Pennsylvania Railroad Company, 290 F.2d 881 (7 Cir. 1961), cert. denied 368 U.S. 900, 82 S.Ct. 174, 7 L.Ed.2d 96 (1961).

■ We think the District Court was correct in finding a "minor dispute" existed between the parties and under existing law there is no question that an injunction could issue to prohibit a work stoppage when the "minor dispute" was before the Railroad Adjustment Board for a compulsory and binding decision. There is, however, a question concerning the District Court's authority to issue an injunction where the dispute has not been submitted to the Railroad Adjustment Board. Neither party has raised this issue nor favored the Court with their views on this vital point. It is, therefore, with a feeling of some trepidation that we enter into a discussion of this issue.

Initially the onus in this case for the failure to process all of the minor issues to the point where they could be submitted, without question, to the Railroad Adjustment Board rests on the Lodge. It admittedly has not complied with the statutory procedures set forth in the Act at § 153, First (i), that provides for the resolution of "minor disputes"—" * * * shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes * * *." Rule 11(b) of the January 1, 1967 collective-bargaining agreement in substance restates § 153, First (i) procedures for the appeal of grievances made by R. E. A. employees— " * * * in the regular order of succession up to and including the highest official designated by the Management to whom appeals may be made * * *." None of the grievances listed on the "Special Meeting Notice" of April 5, 1967 had been so processed. (The appeal in the Riden dismissal was still pending at the time of the hearing). The District Court found that the R. E. A. was " * * ready and willing to and has complied with all procedures of the Railway Labor Act * * *."

However, does the Norris-LaGuardia Act, 29 U.S.C. §§ 101–115 preclude the jurisdiction of the District Court to issue an injunction in a "minor dispute" before the matter is submitted to the Railroad Adjustment Board? In Rutland, supra, 307 F.2d at p. 32, f. n. 7 Judge Waterman noted that there is some doubt as to whether a federal court had such power. The doubt stems from the decision of the Supreme Court in Manion v. Kansas City Terminal Railway Co., 353 U.S. 927, 77 S.Ct. 706, 1 L.Ed.2d 722 (1957), which in a per curiam opinion vacated a judgment of the Kansas City Court of Appeals that had affirmed a State circuit court's issuance of an injunction to prevent the union from striking over disputed time claims. The Kansas City Court of Appeals found the disputes to be "minor" in nature, and upheld the injunction on general equity principles. The Supreme Court remanded for pro-

ceedings not inconsistent with the Court's decision in Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Co., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957) and " * * * without prejudice to the power of the Court of Appeals to reinstate its judgment if the dispute is submitted to the Adjustment Board by either party within a reasonable time."

In *Chicago River,* supra, the stated issue was " * * * whether a railway labor organization can resort to a strike over matters pending before the Adjustment Board." 353 U.S. at 31, 77 S.Ct. at 636. The Supreme Court found that the Norris-LaGuardia Act and the Railway Labor Act must be accommodated, but that the specific provisions of the Railway Labor Act take precedence over the more general provisions of the Norris-LaGuardia Act. 353 U.S. at 40–42, 77 S.Ct. 635. The Norris-LaGuardia Act was held not to be a bar to an injunction issued to prevent a strike which would defeat the jurisdiction of the Adjustment Board, a Board expressly created by Congress to provide for compulsory arbitration of "minor disputes".

Some courts have read the *Manion* and *Chicago River* cases as standing for the proposition that if a "minor dispute" is not actually pending before the Adjustment Board, then no injunction can be issued pertaining to that dispute. E. g., Butte, Anaconda & Pacific Railway Company v. Brotherhood of Locomotive Firemen and Enginemen, 268 F.2d 54 (9 Cir.

1959) at p. 60, f. n. 10. (*Butte,* however, was concerned with a "major dispute"); See *Rutland,* supra, f. n. 7, p. 32 of 307 F.2d. We believe such a reading is too restrictive in that it would, in given situations, render the courts powerless to give effect to purposes of the Railway Labor Act. In Brotherhood of Railroad Carmen of America, Local No. 429 v. Chicago and Northwestern Railway Company, 354 F.2d 786 (8 Cir. 1965), Chief Judge Vogel noted that this Circuit has complied with the *Chicago River* case and recognizes that neither party to a "minor dispute" may resort to self-help to defeat the Adjustment Board's jurisdiction. In *Carmen* no referral to the Adjustment Board had been made by either party. The carrier had scheduled a hearing and an investigation pursuant to the Act and had made every reasonable effort to settle the dispute; the union struck prior to the hearing. Chief Judge Vogel reasoned that since under the contract involved and the Act the carrier could do nothing more, an injunction could properly be issued to protect the possible future jurisdiction of the Adjustment Board.[7]

In Louisville & Nashville Railroad Company v. J. M. Brown, 252 F.2d 149 (5 Cir. 1958), cert. denied 356 U.S. 749, 78 S.Ct. 913, 2 L.Ed.2d 843 (1958), the Court stated:

"Obviously the statutory right of either party to refer the dispute to the board would be as effectively frus-

---

7. The Court in *Brotherhood of Railroad Carmen,* in answering the argument that the injunctive process of the court could not be invoked until a dispute was before the National Railroad Adjustment Board, said, at pp. 794–796:

"In answer to the foregoing argument, it is clear that in the instant case, at the time of the illegal and unauthorized strike, the carrier had made 'every reasonable effort' to settle the dispute involved, even though the dispute had not yet gone before the Adjustment Board.
 * * * * *
"The carrier had started necessary proceedings under the Railway Labor Act by scheduling a hearing and investigation. This was a prelude to invoking

jurisdiction of the Adjustment Board. It could reasonably have done no more with the particular dispute involved in this appeal until such time as the hearing and investigation had taken place and until a full statement of the facts and all supporting data had been prepared. Since the policies of the National Railway Labor Act concerning a 'minor dispute' were applicable in this case, it makes no sense to say that there could not be an injunction to protect the jurisdiction of the Adjustment Board just because a formal referral had not been made to it. It could have been made in due course. The carrier had done all that was required of it."

trated by self-help by one of the parties in the pre-submission stage of the negotiations as it would by strike action after a submission of the issues to the board as in the *Chicago River* case. The harmful effects would be even more pronounced, for if a strike were permitted before or during negotiations of the grievance which are *required* by the Act, there need be no waiting period at all. It is not believed that the Supreme Court * * * would hold that a strike would be legal if it occurred before the first step had been taken, or, as here, before the first step had been completed." 252 F.2d at p. 153.

The Court noted that in *Manion* the grievance procedures had been completed and either party could have submitted the dispute to the Adjustment Board. The posture of the case in *Louisville* was that the dispute was only a few days old when the union struck and neither party could go to the Adjustment Board.

The rationale of *Carmen,* supra, and *Louisville,* supra, is applicable to the present dispute. The Lodge refuses to process its grievance on the size of the labor "pool" through the various steps provided for in the collective-bargaining agreement, contending the dispute is a "major" one; while R. E. A. represents itself as ready and willing to attempt a settlement or at least co-operate in processing the dispute through the collective-bargaining procedures provided in the agreement, and failing a settlement thereby to submit the dispute to the Railroad Adjustment Board. Self-help should not be utilized at this point, and both parties are subject to the requirements of the Railway Labor Act.

The purpose of the Railway Labor Act is not only to encourage the settlement of labor disputes by the parties involved but in the event of the "minor dispute" to give either party the option of submitting the dispute to the Railroad Adjustment Board for a compulsory binding arbitration award. Before any injunctive process should issue the petitioning party should avail itself of any existing administrative remedy and neither party should resort to self-help until the existing administrative procedures have been exhausted. Under § 153, First (i) the Board will not take jurisdiction over a dispute except upon petition by one or both of the parties. Where the parties are in disagreement on the nature of the dispute and on the procedure to be followed in resolving it, the party seeking injunctive relief (to enforce the provisions of the Railway Labor Act) must comply with the so-called "clean hands" requirement of § 8 of the Norris-LaGuardia Act, 29 U.S.C. § 108.[8] This panel is not in complete agreement on the question of whether R. E. A. has exhausted its available administrative remedies. The District Court found that R. E. A. by expressing itself as ready and willing to comply with the procedures of the Railway Labor Act had met the requirements of § 8 of the Norris-LaGuardia Act. This would be correct if no further administrative remedy were available to R. E. A.

It has been generally stated that either side may submit a "minor dispute" to the Railroad Adjustment Board. The Supreme Court recognized this right in Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Co., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957) using the following phraseology at p. 34, 77 S.Ct. at p. 637:

" * * * Congress has set up a tribunal to handle minor disputes which have not been resolved by the parties themselves. Awards of this Board are 'final and binding upon both parties.'

---

8. Section 108 reads:
"No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration."

And either side may submit the dispute to the Board. * * *"

And the Second Circuit in Westchester Lodge 2186, Brotherhood of Railway & Steamship Clerks, Freight Handlers, Express and Station Employes, AFL–CIO v. Railway Express Agency, Inc., 329 F.2d 748 (1964) at p. 751 makes the categorical statement " * * * Either party may compel the arbitration of a minor dispute by the Adjustment Board." In the present posture of this dispute we think R. E. A. should submit the dispute to the Railroad Adjustment Board by petitioning "the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes," in accordance with § 3(i) of the Railway Labor Act. It is not for our determination at this juncture to determine whether the Railroad Adjustment Board would accept jurisdiction of this dispute as that is a matter to be determined, initially at least, by the Railroad Adjustment Board. This dispute is not one concerning the individual grievances of a few members on their contract rights but is one concerned with the size of the labor "pool", which would affect a large proportion of the Lodge's members. The size of the dispute or magnitude thereof is ordinarily not a factor in classifying a dispute as a "major" or "minor" one. But see Order of Railroad Telegraphers v. North Western Railway Co., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960) cited by the Lodge in support of its position. That case stated at p. 341, 80 S.Ct. at p. 767: "But it is impossible to classify as a minor dispute this dispute relating to a major change, affecting jobs, in an existing collective-bargaining agreement, rather than to mere infractions or interpretations of the provisions of that agreement." However, the issue in the case at bar is not the abolishment of the "bulletined" jobs, but the size of the labor "pool". See also Rutland Railway Corporation, supra, at p. 36 of 307 F. 2d. Assuming that R. E. A. has the right to abolish the "bulletined" positions, the question remains of whether

under the collective-bargaining contract or contracts it has the right to determine the size of the labor "pool". This, being a matter of interpretation of the collective-bargaining agreement, is for the Railroad Adjustment Board's determination and upon its ultimate resolution we express no opinion. Therefore, it could well be that under the present factual situation the Adjustment Board would accept jurisdiction and resolve the impasse that has been reached by the parties, both as to the nature of the dispute and as to the proper method of procedure in the consideration and ultimate resolvement of the dispute.

▆▆▆▆ We, therefore, resolve our own differences by agreeing that since the petitioning party (for an injunction) should avail itself of all existing administrative remedies, R. E. A. should attempt submission of the dispute to the Railroad Adjustment Board. This would then place R. E. A. in a position of utilizing all of its possible administrative remedies, while petitioning for injunctive relief, and still leave the Lodge free to press its view of the nature of the dispute and the merits of the dispute to the Adjustment Board. The Railway Labor Act does comprehend, encourage and command the parties to attempt settlements of all disputes by conferences, private negotiations and collective-bargaining procedures and then, failing to settle a dispute, the Act permits compulsory arbitration on "minor disputes" at the option of either party. It does not appear that the Railway Labor Act can be made fully effective if either side can destroy the primary jurisdiction of the Railroad Adjustment Board by (1) either failing to co-operate in the collective-bargaining grievance procedures, or (2) by taking diametrically opposed positions on the nature of the dispute. If the dispute is in fact a "minor" one, the primary jurisdiction for its resolvement rests in the Railroad Adjustment Board; and as the Act states, either party may refer the dispute to the Adjustment Board. If the Adjustment Board refuses to accept jurisdiction on the basis that

the dispute is not "ripe" for determination, then R. E. A. will have exhausted its available administrative remedies and the temporary injunction should stand; unless, of course, it is determined that the dispute is a "major" one, in which event the parties will have to follow the procedures outlined under the Railway Labor Act for "major" disputes.

International Association of Machinists, AFL–CIO v. Northwest Airlines, Inc., 304 F.2d 206 (8 Cir. 1962), cited by the Lodge is not inconsistent with the above analysis. In that case the carrier was denied injunctive relief because of a failure to exhaust available administrative remedies, this Court holding that where the highest level of management had participated in negotiations which precipitated the dispute, a referral to the Adjustment Board could have been made. This procedure, which was available to the carrier, had not been utilized. The Norris-LaGuardia Act, 29 U.S.C. § 108, therefore, precluded injunctive relief.

■ The Lodge's final argument that the injunction as drafted imposes restrictions on legitimate union activities that trample on fundamental constitutional rights is without merit. A plain reading of the injunction shows that it is specifically directed at preventing a work stoppage over the grievances set forth in the "Special Meeting Notice" either by the calling of a meeting of all of the Lodge members (or a number thereof so as to interfere with R. E. A.'s operation), or by other means. Nothing prevents the Lodge from holding its regular "split session" meetings. In *Carmen*, supra, Chief Judge Vogel remanded the injunction there involved with instructions " * * * to modify the injunction

in accordance with this opinion to cover only minor disputes that may arise under the Railway Labor Act out of courses of conduct similar to that involved herein." 354 F.2d at p. 801. The injunction issued by the District Court meets this criteria, and is to be considered as only applicable to the present dispute as set out in the complaint and not as a continuing open-end injunction *in futuro*.

■ In conclusion we believe that the District Court had authority under the Railway Labor Act to issue the injunction enjoining the proposed work stoppage in order to allow the parties to take steps under the Railway Labor Act to resolve this dispute; and that at the time of the issuance of the temporary injunction R. E. A. had no adequate remedy at law but that under the *Manion* case, supra, and International Association of Machinists, AFL–CIO v. Northwest Airlines, Inc., supra, R. E. A. should exhaust its administrative remedies, while seeking the benefit of the injunctive powers of the court.

■ This matter is, therefore, remanded to the District Court with instructions to dissolve the temporary injunction within twenty days after the issuance of our mandate, unless R. E. A. takes appropriate steps to submit the dispute to the Railroad Adjustment Board. The District Court would also have jurisdiction to determine whether additional hearings are in order to pass upon the issue of whether the *status quo* should be maintained, pending a decision by the Railroad Adjustment Board, and upon this latter issue we express no opinion.[9]

Remanded for proceedings not inconsistent with this opinion.

---

9. As noted in Hilbert v. Pennsylvania Railroad Company at p. 884 of 290 F.2d, 881:
"Nothing in the Norris-LaGuardia Act prevents a federal court from granting an injunction to require an employer to retain the *status quo*. However,

there is nothing in the Railway Labor Act that imposes such an obligation on the railroad in the case of a minor dispute. The *status quo* provisions of the Act are found only in the sections dealing with major disputes."